IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **ELLA L. JONES,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Civil No.** 14-cv-111-CJP[1] |
| ) | |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner of Social** ) | |
| **Security,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Ella L. Jones is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying her Disability Insurance Benefits (DIB).

## Procedural History

Plaintiff applied for benefits in August 2010, alleging disability beginning on March 28, 2010. (Tr. 15). After holding an evidentiary hearing, ALJ William L. Hafer denied the application for benefits in a decision dated October 12, 2012. (Tr. 15-27). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c).  See, Doc. 7.

**Issues Raised by Plaintiff**

Plaintiff raises the following points:

1. The ALJ ignored or misstated important evidence.

2. The ALJ impermissibly played doctor.

3. The ALJ erred in forming plaintiff's credibility determination.

4. The ALJ erred in determining plaintiff's RFC, including his consideration of opinion evidence.

5. The ALJ's decision was not supported by substantial evidence.

**Applicable Legal Standards**

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §423(d)(3).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals

has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, **649 F.3d 565, 568-569 (7ᵗʰ Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **20 C.F.R. §§ 404.1520;** *Simila v. Astrue*, **573 F.3d 503, 512-513 (7ᵗʰ Cir. 2009);** *Schroeter v. Sullivan*, **977 F.2d 391, 393 (7ᵗʰ Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and

cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, **737 F.2d 714, 715 (7th Cir. 1984).** *See also Zurawski v. Halter*, **245 F.3d 881, 886 (7th Cir. 2001)**(Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. **See,** *Books v. Chater*, **91 F.3d 972, 977-78 (7th Cir. 1996)** (citing *Diaz v. Chater*, **55 F.3d 300, 306 (7th Cir. 1995)**). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, **91 S. Ct. 1420, 1427 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve

conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, **103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, **597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

## The Decision of the ALJ

ALJ Hafer followed the five-step analytical framework described above. He determined that plaintiff had not been engaged in substantial gainful activity since her alleged onset date. (Tr. 17). He found plaintiff had severe impairments of degenerative disc disease of the lumbar, thoracic, and cervical regions of the spine, with fusions of C4 through C7, hypertension, and a pain disorder with both physical and psychological features. The ALJ further determined these impairments do not meet or equal a listed impairment. (Tr. 18).

The ALJ found plaintiff had the residual functional capacity (RFC) to perform work at the light level, with physical and mental limitations. (Tr. 19-20). Based on the testimony of a vocational expert (VE), the ALJ found that plaintiff was unable to perform her past work. However, she was not disabled because she was able to do other jobs which exist in significant numbers in the regional and national economies. (Tr. 25-26).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

**1. Agency Forms**

Plaintiff was born on September 25, 1958 and was fifty-one years old at the alleged onset date. She was insured for DIB through December 31, 2014. (Tr. 170). Plaintiff was five feet seven inches tall and weighed one hundred and sixty-five pounds. (Tr. 182). She completed the twelfth grade as well as secretarial school. (Tr. 182-83).

According to plaintiff, degenerative disc disease with three fusions made her unable to work. (Tr. 182). She previously worked as a production line worker for a factory and a printing company. (Tr. 173). She took several medications and as of October 2010, she was taking Zoloft for depression, Ziac for high blood pressure, and Oxycontin, Norco, Morphine, and Motrin for her back pain. (Tr. 185).

Plaintiff submitted Function Reports in September 2010 and February 2011. (Tr. 194-208, 220-34). She stated that she lived in a mobile home with her husband. (Tr. 194). She was able to prepare simple meals like cold cereal, chicken breasts, or she reheated leftovers but she did not spend more than fifteen minutes preparing a meal. (Tr.194, 222). Plaintiff stated that raising her arms over her head caused increased pain in her shoulders and neck. She watched TV and was able to go for a walk every afternoon. Her neurologist suggested she take

a walk daily in order to help her back heal. (Tr. 194). She was only able to walk half a mile before needing to stop and rest for about fifteen minutes. (Tr. 228).

Plaintiff stated she had pain and stiffness in her back, neck, left shoulder, and hips. She reported she had a limited ability to stand for long periods of time due to weakness in her legs and hip as well as fatigue. (Tr. 223). When performing chores around her home she needed to take several breaks and regularly required the assistance of her husband. (Tr. 222, 225). She was unable to carry laundry or groceries. (Tr. 194, 222, 225). Plaintiff stated she rested for most of the day and had difficulty sleeping at night. (Tr. 194). She had trouble getting dressed and claimed to have difficulty squatting, bending, standing, reaching, sitting, kneeling, hearing, remembering, and concentrating. (Tr. 198, 227-28).

## 2. Evidentiary Hearing

Plaintiff was represented by a non-attorney advocate at the evidentiary hearing on September 20, 2012. (Tr. 41). She was fifty-three years old and testified to being five feet eight inches tall and weighing on hundred and sixty-five pounds. (Tr. 44).

In 1995, plaintiff began working at a company called Nasco where she assembled automotive parts such as bumpers. She typically lifted between ten and fifty pounds at her job. She worked there until her second cervical spinal surgery occurred in 2010. She attempted to return to work after her surgery in a new department with new restrictions on reaching and using smaller parts. (Tr.

45). However, she could only work for a few days before resigning due to pain. (Tr. 44).

She testified that she goes grocery shopping with her husband twice a month. Plaintiff had her license but testified that her husband typically drove. (Tr. 50). At the time of the hearing, she had not driven in two weeks. (Tr. 51). She received injections for pain, but stated they only helped for about three months. While additional surgery had not been recommended, plaintiff was seeking a second opinion. She took medications to help with pain, but they made it difficult to comprehend things at times. (Tr. 51). Plaintiff testified that she had bad headaches and needed to take Naproxen to help deal with the pain. (Tr. 52).

Plaintiff could not turn her head more than twenty degrees to the left and ten degrees to the right due to her cervical spinal fusion. She stated that it was painful to look up or look down for extended periods of time. (Tr. 53). Additionally, she found it difficult and painful to raise her arms above her head. She kept her hair short in order to reduce the amount of time she had to raise her arms. She found bending difficult and, as a result, her husband adjusted their front loading washing machine and drier so that she did not have to bend to reach inside. (Tr. 56).

A vocational expert (VE) also testified. The ALJ asked the VE a hypothetical that comported with the ultimate RFC assessment, that is, a person could lift or carry ten pounds frequently, twenty pounds occasionally, and sit, stand, or walk for six hours out of an eight hour day. Additionally, the person would be limited

to occasional stooping, kneeling, crawling, crouching, stair climbing, and reaching overhead bilaterally. They could never climb ropes, ladders, or scaffolding, and could never work with heights or dangerous machinery. The person would be limited to simple, repetitive tasks performed at a slow to moderate pace that falls short of the speed of a typical assembly or production line. (Tr. 58-59).

The VE testified that plaintiff's past work assembling automotive vehicles would be precluded. However, other jobs existed in significant numbers in the national economy. Examples of such jobs are light housekeeping attendant or unskilled hand packing jobs. The VE also testified that if the person missed two or more unscheduled days a month it would likely result in termination. (Tr. 59).

### 3. Medical Treatment

Plaintiff began having headaches and progressive pains in her neck in 2005. Later that year, her neurosurgeon, Dr. Kennedy, performed a right-sided anterior cervical discectomy and fusion at C5-6 and C6-7. This provided relief for about four years until her symptoms returned in 2009. (Tr. 387).

In August 2009, plaintiff first presented to her primary care physician, Dr. Russell Coulter, with low back pain. Plaintiff reported her pain as an eight out of ten (Tr. 313, 315, 319).  In November 2009, Dr. Coulter ordered MRIs of plaintiff's spine which revealed accelerated disc disease at the level above where surgery was previously performed. (Tr. 317, 327). The MRI report noted that the disc disease created substantial central and foraminal stenosis that resulted in bilateral C5 nerve root impingement which was severe on the right. Additionally,

mild cord impingement was noted as well as foraminal stenosis that may have affected the right C7 nerve root. (Tr. 317). Dr. Coulter assessed plaintiff with cervical radiculopathy and referred plaintiff back to her neurosurgeon for an evaluation. (Tr. 314).

Plaintiff saw Dr. Kennedy again in February 2010. Dr. Kennedy's diagnostic impression was disc herniation at C4-5 and post-operative changes at C5-6 and C6-7. (Tr. 286-87). Due to plaintiff's degree of pain Dr. Kennedy felt surgical intervention was necessary. (Tr. 287). On March 29, 2010 plaintiff underwent a C4-5 complete discectomy and partial vertebrectomy, C4-5 microdissection, C4-5 anterior cervical fusion and plating, and insertion of a biomechanical spacer at C4-5. (Tr. 297, 299).

In June 2010, plaintiff saw Dr. Kennedy for a follow-up appointment. She was doing well with no pain and an improved range of motion. Dr. Kennedy felt plaintiff could return to work the next month and she should start physical therapy for six weeks. (Tr. 280). Plaintiff next saw Dr. Kennedy in August 2010 and reported having quite a bit of pain at the base of her cervical spine. Dr. Kennedy stated plaintiff's range of motion was "quite limited" and she would have to live with significant restrictions. He stated she should do no overhead lifting, minimal bending, twisting, or stooping, and no lifting over ten pounds. Additionally, he stated she should not sit or stand for more than one hour without an opportunity to lie down. (Tr. 277).

Plaintiff also saw Dr. Coulter in August 2010. (Tr. 307-8). Her pain was an eight out of ten and she had numbness in her arm, back pain, and sleep disturbance. He noted plaintiff was applying for disability and had quit her job. (Tr. 307). His assessment was depression, menopausal state, hypertension, and chronic neck pain causing disability which was "likely permanent." (Tr. 308).

Plaintiff did not see Dr. Coulter again until January 2011, when she asked to be referred to a back specialist. She stated her pain was a seven out of ten and was in her low back, neck, hip, and tailbone. (Tr. 370). Dr. Coulter's assessment was cervical radiculopathy and hypertension. He referred plaintiff to a specialist and ordered additional MRIs. (Tr. 371). The MRI of plaintiff's lumbar spine revealed multilevel degenerative spondylosis that was moderately advanced involving the L3-4 disc and left L5-S1 facet. No substantial stenosis or neural impingement was shown. (Tr. 373). An MRI of plaintiff's thoracic spine revealed minimal degenerative spondylosis with two discrete disc extrusions at T7-8 on the left and T8-9 on the right. No substantial stenosis or neural impingement was discovered. (Tr. 375). The MRI of plaintiff's cervical spine revealed post-operative features of inter body fusion at multiple levels, improved stenosis of the C4-5 level, residual foraminal stenosis which could be clinically significant on the right. Lesser foraminal stenosis was discovered at the C6 and C7 levels and additional disease above the level of surgery that could affect the left C3 and bilateral C4 nerve roots. (Tr. 378).

In February 2011, plaintiff saw Dr. Neill Wright in the department of neurological surgery at Washington University in St. Louis. (Tr. 387-90). She had not been to a pain management specialist and denied radiating pain into her arms or legs. She had intermittent numbness in her fingers, pain in her neck, thoracic spine, and low back, as well as migrating pain from her shoulder blades to the back of her head. (Tr. 387). After reviewing plaintiff's MRIs, Dr. Wright opined that plaintiff had degenerative disc disease in her thoracic, lumbar, and cervical discs. However, she did not show any signs of spinal cord compression or significant nerve root compression. He found some anterior collapse of the C3-4 disc in flexion, and left C3 and bilateral C4 foraminal stenosis. (Tr. 388-89). Dr. Wright did not feel additional surgery would help her symptoms and noted that axial pains were notoriously difficult to treat with surgery. He opined that plaintiff would benefit from seeing a pain management physician. (Tr. 390).

Plaintiff returned to Dr. Coulter in February 2011 and he referred her to a pain management specialist. (Tr. 397). Plaintiff began receiving cervical and lumbar epidural steroid injections from Dr. Anthony Anderson shortly thereafter. (Tr. 411-12, 439). She saw Dr. Coulter again in May 2011 and reported the injections were helping decrease some of her pain. (Tr. 445). Dr. Coulter assessed plaintiff as "healthy" on his check-box treatment forms and prescribed pain medications. However, plaintiff continued to see Dr. Coulter through 2012 and always presented with back and neck pain. (Tr. 307-20, 366, 448, 454-55).

### 4. Consultative Examination

In November 2010, plaintiff saw Fred Klug Ph.D. for a consultative mental examination. (Tr. 332-35). Dr. Klug felt plaintiff's reasoning was good, her abstract thinking was fair, and her fund of knowledge for remote facts was adequate. Plaintiff's immediate and long-term memory were intact but her short term memory was impaired. (Tr. 333). Dr. Klug opined that plaintiff's judgment was good but her insight was poor. His diagnostic impressions were pain disorder with psychological factors and a medical condition. (Tr. 334).

### 5. Opinions of Treating Physicians

Plaintiff's primary care physician, Dr. Coulter, completed a mental RFC for plaintiff in September 2011. (Tr. 443-44). He felt plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods of time, perform activities within a schedule, and sustain an ordinary routine without special supervision. (Tr. 443). He also opined that plaintiff was moderately limited in her ability to work in coordination with or proximity to others without being distracted by them, make simple work related decisions, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain social appropriate behavior and adhere to basic standards of neatness and cleanliness, and respond appropriately to changes in the work setting.

Dr. Coulter felt plaintiff was markedly limited in her ability complete a normal workday and workweek without interruptions from psychologically based

symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 444).

Plaintiff's neurosurgeon, Dr. Kennedy, completed a medical source statement in March 2011. (Tr. 398-99). He felt plaintiff had a marked limitation on her ability to maintain attention and concentration due to pain. (Tr. 398). While he opined that plaintiff could do simple grasping, she could not push, pull, or perform fine manipulations. Additionally, plaintiff could only sit, stand, or walk for less than an hour each and could never lift over ten pounds. He stated plaintiff was never able to bend, squat, crawl, climb, or reach above shoulder level. (Tr. 399).

### 6. RFC Assessment

Dr. Lenore Gonzalez performed a physical RFC for plaintiff in December 2010. (Tr. 351-354). He opined that plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, and stand, walk, or sit for six hours out of an eight hour day. (Tr. 351). Dr. Gonzalez felt plaintiff could only occasionally balance, stoop, kneel, crouch, crawl, or climb ladders, ropes, and scaffolds. (Tr. 352). He also stated plaintiff was limited in her ability to reach in all directions and should avoid concentrated exposure of hazards such as heights or machinery. (Tr. 353-54).

In December 2010, Howard Tin Psy.D., performed a mental RFC assessment. (Tr. 358-60). Dr. Tin felt plaintiff was moderately limited in her ability to understand and remember detailed instructions, maintain attention and

concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (Tr. 358-60).

These opinions were affirmed by disability determination services physicians Dr. Julio Pardo, M.D. and Dr. M.W. DiFonso, Psy.D. (Tr. 391-93).

## Analysis

Plaintiff contends the ALJ's discussion of plaintiff's medical evidence was flawed. She argues that the ALJ did not provide an adequate analysis of Dr. Kennedy's opinions as plaintiff's treating neurosurgeon. The ALJ looked at two of Dr. Kennedy's opinions and assigned one "limited weight" and another "insignificant weight." (Tr. 22, 23). The ALJ is required to consider a number of factors in weighing a treating doctor's opinion.  The applicable regulation refers to a treating healthcare provider as a "treating source." The version of 20 C.F.R. §404.1527(c)(2) in effect at the time of the ALJ's decision states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. [Emphasis added]

A treating doctor's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. *Clifford v. Apfel*, **227 F.3d 863 (7th Cir. 2000);**

*Zurawski*, **245 F.3d at 881.** Supportability and consistency are two important factors to be considered in weighing medical opinions.  In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record." *Schaaf v. Astrue,* **602 F.3d 869, 875 (7th Cir. 2010), citing §404.1527(d).**

The ALJ looked at Dr. Kennedy's treatment notes indicating plaintiff should do minimal bending, twisting, stooping, no lifting over ten pounds, no overhead lifting, and that plaintiff should not sit or stand for more than one hour without the opportunity to lie down. (Tr. 21-22, 277). The ALJ gave this opinion limited weight because the overall evidence did not support her inability to lift over ten pounds or need to lie down after an hour of sitting or standing.

While the ALJ is only required to minimally articulate his reasons for rejecting evidence, his reasoning has to be sound. *Berger v. Astrue*, **516 F.3d 539, 545 (7th Cir. 2008);** *Jelinek v. Astrue*, **662 F.3d 805, 811 (7th Cir. 2011).** Here, the Court agrees with plaintiff that ALJ Hafer's analysis is insufficient.

The ALJ's analysis of Dr. Kennedy's first opinion is extremely vague. He broadly states that the overall evidence, including later treatment records and plaintiff's documented activities, do not support plaintiff's inability to lift over ten pounds or need to lie down. The ALJ does not establish which later treatment

records or documented activities are in opposition to Dr. Kennedy's findings. He merely says that they exist and moves on with his analysis.

Plaintiff's reported daily activities were extremely limited. She stated that she cooked simple meals and performed minimal household chores. Plaintiff needed her husband's assistance to carry laundry and groceries and she spent most of her day resting. (Tr. 225). These reported activities seem to support, not contradict, Dr. Kennedy's opinion she needed to lie down regularly and should not carry over ten pounds.

Later in the ALJ's opinion he references plaintiff's ability to walk her dogs and exercise several times a week. First, in plaintiff's most recent function report she stated her husband took care of the dogs as she was no longer capable of doing so herself. (Tr. 223). Second, plaintiff's "exercise" was walking one mile a day which was recommended by Dr. Kennedy. The Court fails to see how Dr. Kennedy's advice that plaintiff occasionally walk is in opposition to his opinion she had significant restrictions. Additionally, the Seventh Circuit has held that rehabilitative efforts such as walking "are not necessarily transferrable to a work setting with regard to the impact of pain." *Scrogham v. Colvin*, **765 F. 3d 685, 701 (7th Cir. 2014).**

ALJ Hafer's statement that later treatment records did not support Dr. Kennedy's first opinion is also inadequate. He fails to reference any later treatment records in opposition to plaintiff's lifting restrictions or need to lie down. Dr. Kennedy's limitations were based on the level of pain plaintiff

experienced regularly. The later treatment records show plaintiff continually sought medical treatment, received epidural injections, and took prescription narcotics for her back pain. (Tr. 388). None of her physicians recommended that she return to work and none of them indicated her pain was not substantial. The Seventh Circuit has established that meaningful review requires the ability of the reviewing court to follow the ALJ's reasoning. *Clifford*, **227 F.3d at 874.** Here, the Court is unable to follow ALJ Hafer's reasoning as his vague statements do not provide adequate explanation.

The ALJ also analyzed Dr. Kennedy's medical source statement from March 2011. He assigned this statement limited weight because of the timing of the statement, inconsistencies with plaintiff's daily activities, and inconsistencies with Dr. Kennedy and Dr. Wright's records.

ALJ Hafer focused primarily on perceived inconsistencies with the treatment record in giving this opinion insignificant weight. He stated that Dr. Kennedy's own treatment notes and the report of Dr. Wright confirmed improvement in the plaintiff's overall condition after surgery. The ALJ looks primarily at Dr. Kennedy's initial treatment notes after surgery which indicated plaintiff was doing much better and could return to work. The ALJ also puts a great deal of emphasis on certain portions of Dr. Wright's treatment notes while discarding others. He focuses on a very select portion of the record but fails to acknowledge the rest in his analysis of this opinion. This is error.

Plaintiff attempted to return to work after her surgery but her pain was so significant she resigned shortly thereafter. (Tr. 45, 277). In fact, her treatment notes from other physicians after she attempted to return to work show her pain levels at a seven or eight out of ten and indicated she was still having significant trouble with her back. (Tr. 307, 365, 370). Dr. Kennedy's most recent treatment notes stated she would have significant limitations and were in line with his opinions in the medical source statement. (Tr. 277). The ALJ acknowledged some portions of these records elsewhere in his opinion but he seemingly disregards them when providing the medical source statement with insignificant weight.

Dr. Wright's notes indicate plaintiff had cervical disc degeneration, thoracic disc degeneration, lumbar disc degeneration, cervicalgia, and lumbago. (Tr. 289). He stated the type of pain she experienced was notoriously difficult to treat with additional surgery and recommended that plaintiff see a pain management specialist. (Tr. 390). The ALJ focuses on the fact that surgery was not recommended as an indication that Dr. Wright's notes do not support Dr. Kennedy's opinion. This is incorrect. Dr. Wright made no statements about plaintiff's functional capacity and is not inconsistent with Dr. Kennedy's opinion. The Seventh Circuit has held that the requisite logical bridge does not exist when a primary piece of evidence relied upon by an ALJ "does not support the propositions for which it is cited." *Scott v. Astrue*, **647 F.3d 734, 740 (7ᵗʰ Cir. 2011).**

In weighing the medical opinions, the ALJ is not permitted to "cherry-pick" the evidence, ignoring the parts that conflict with his conclusion. *Myles v. Astrue*, **582 F.3d 672, 678 (7th Cir. 2009).** While he is not required to mention every piece of evidence, "he must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position." *Godbey v. Apfel*, **238 F.3d 803, 808 (7th Cir. 2000).** The ALJ impermissibly "cherry-picks" portions of Dr. Kennedy's and Dr. Wright's records focusing only on the treatment records that indicate plaintiff was doing well.

The ALJ also references plaintiff's daily activities again as a reason for giving the opinion insignificant weight. He focuses on the fact that "there is no indication that [plaintiff] lies down for nearly the entire day." (Tr. 23). First plaintiff correctly states that this statement misconstrues Dr. Kennedy's report. He did not state plaintiff needed to lie down for nearly the entire day. He stated plaintiff needed the opportunity to lie down after sitting or standing for an hour. Additionally, plaintiff indicated in her testimony that she did spend a significant portion of her day resting. (Tr. 46-47, 49, 52). No obvious inconsistencies between plaintiff's daily activities and the medical source statement from Dr. Kennedy exist.

Finally, the ALJ states the medical source statement was prepared months after Dr. Kennedy had last treated plaintiff. ALJ Hafer does not describe how the timing of Dr. Kennedy's statement makes it less credible. He simply states when it was written and continues his opinion. This is error. As plaintiff points out, the

ALJ does not discuss any subsequent changes that occurred in plaintiff's medical treatment between when Dr. Kennedy last saw plaintiff and when he wrote his medical source statement. There was no indication in the record that plaintiff's level of functioning had increased or her condition had improved in the months between Dr. Kennedy's last treatment of plaintiff and his medical source statement. It is entirely possible that plaintiff's condition had deteriorated in that amount of time and Dr. Kennedy's opinion overstated the level of activity plaintiff was capable of performing. The ALJ merely stating that it had been a few months since she had seen Dr. Kennedy does not provide the meaningful review required.

The ALJ is "required to build a logical bridge from the evidence to his conclusions." *Simila v. Astrue*, **573 F.3d 503, 516 (7th Cir. 2009).** While the ALJ was not required to give Dr. Kennedy's opinion controlling weight, he needed to adequately explain why the opinion was discounted. ALJ Hafer simply failed to do so here. "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Kastner v. Astrue*, **697 F.3d 642, 646 (7th Cir. 2012).**, **citing** *Steele v. Barnhart*, **290 F.3d 936, 940 (7th Cir. 2002).**

It is not necessary to address plaintiff's other points at this time. The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or that she should be awarded benefits.  On the contrary, the Court has not formed any opinions in that

regard, and leaves those issues to be determined by the Commissioner after further proceedings.

<h3 style="text-align:center"><u>Conclusion</u></h3>

Plaintiff's motion for summary judgment is granted. The Commissioner's final decision denying Ella L. Jones's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE: February 5, 2015.**

<u>**s/ Clifford J. Proud**</u>
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**